Thank you, Your Honor, and good morning. May it please the Court. I'm Phil from Petitioners Food & Water Watch and Snake River Waterkeeper. I will try to reserve three minutes of time for rebuttal. Your Honor, this case is about protecting Idaho water pollution coming off of concentrated animal feeding operations, or CAFOs. These facilities are sources of significant pollution, already dangerously impairing waters, with many water bodies failing to meet water quality standards because of pollutants commonly associated with CAFOs. And yet, despite this reality on the ground, EPA has arbitrarily decided to treat CAFOs differently than other point sources under the Clean Water Act when it comes to representative monitoring. Without representative discharge monitoring and the permits for these facilities, there's simply no way to hold violating facilities accountable. You know, I've got a question that's puzzled me from the beginning on this one, and it's taken me a while even to figure out what's going on. I think I'm correct that there is no permit at all in Idaho for any CAFO, and we have a lot of CAFOs operating. Is that right? Your Honor, that was the case when this petition was filed. Facts on the ground have changed a little bit since briefing was completed. I will note that the 2020 general permit, which is that issue here, wasn't actually in effect yet. And so, Your Honor is noticing that under the previous general permit, there were zero facilities covered. As of today, there is at least one facility, a large area CAFO, that is seeking coverage under the general permit. I'm having trouble figuring out how the relief you seek will remedy the problem you identify. That is, the record is quite clear, both in terms of what we have right in front of us and what I'm able to read in Federal Register and so on, that we do have quite a bit of pollution coming from the CAFOs into the navigable waters of the United States. Yet, as I read the Second Circuit's opinion in water keepers, and then the later Fifth Circuit opinion in pork producers, because, and I'm not sure I agree with those decisions, but because the CAFOs are supposed to be zero discharge, they can't be required to apply for a permit because the premise for a permit is that they're discharging. And I look at the figures that tell me that various states have a lot of CAFOs that are operating under permits, and some states like Idaho that have none or only one. And I'm trying to figure out what's the reality on the ground here. I mean, this looks to me as though an extremely dysfunctional system. And I'm trying to figure out, even if we were to agree with you that there are more monitoring requirements, every CAFO except maybe one in the whole state of Idaho doesn't make any difference to them because they're not operating under a permit. Can you help me understand what's going on here as a practical matter? Of course, Judge Fletcher. What Your Honor is getting at is, as you understand, the duty to apply attempt that EPA made twice, essentially, and that court struck down. I think it's critical to recognize the matter, the legal question before the court today is what conditions must apply to facilities once they have become covered by the permit. No, I understand that, but I'm trying to understand the context in which we're deciding this case as to whether it really makes any difference whatsoever within the state of Idaho. Of course, Your Honor. Petitioners have every expectation, and I think it's extremely likely, that more facilities in Idaho will be covered by the 2020 general permit for a few reasons. First, EPA put significant effort into developing this permit. It engaged with stakeholders. It engaged with the state over a year process to develop the terms and conditions. In other words, I don't believe that EPA is taking the position that they do not expect facilities to be covered by this permit. Additionally... Well, being covered by the permit is different from applying for the permit. That's true, Your Honor. They're potentially covered if they apply, but what requires them to apply? What's the incentive to apply? Well, I would point, Your Honor, to the record where we have the three largest industry associations in the state of Idaho representing CAFOs commented on the draft permit, and much of those comments are identifying challenges or issues they have with the draft as it would apply to their membership that they either state in their comments or impliably say they expect to be covered by these terms and conditions. So we have the Idaho Cattle Association, the Idaho Dairymen's Association, as well as the J.R. Simplot Company, which in petitioners' eyes indicates that this industry is interested in applying. And keep in mind, there are benefits for a facility to be covered under the general permit. It provides a permit shield. It provides regulatory certainty. And so I think it's completely reasonable for the court and for petitioners to expect that a favorable ruling from this court will have concrete effects on the ground in terms of actually generating meaningful monitoring data to assure compliance. It's such a bizarre thing, though, because, I mean, maybe you're right that some of them will choose voluntarily to be under this permit, but if we agree with you it makes the permit more onerous, then maybe they won't. So there's this weird hypothetical nature of this whole dispute that I'm having trouble getting my head around. Can you explain how we know that if we agree with you, anyone will be bound by it? Other than the reasons I've provided, Your Honor, I think that's the basis for our expectation. Additionally, in those comments, there was at least one facility, one of the largest CAFOs in Idaho, essentially admitted to discharges to the agency, and so we fully expect that they will become covered as well. And if I may take a step back, because I agree with Your Honor that it's an unusual situation, and I think that it goes to the core of this case because the way that EPA has chosen to regulate this industry in the past, in Idaho, where it has failed to require representative monitoring back when there were over 100 facilities covered, it has essentially created this feedback loop of unaccountability where because data has not... It just seems like the problem is so much farther back. I mean, no one has to apply for a permit. Runoff from agriculture doesn't count. I mean, those are the real problems, right? And then with the little tiny thing that's left, if anyone volunteers, maybe there need to be more requirements for effluent limits, but then the monitoring would be a bat. So you're like four steps down the chain of how this problem could be regulated, and it just seems like there may be a huge problem, but we have a lot of things in the way, like the runoff exemption from the Clean Water Act and this no obligation to get a permit at all problem. Your Honor, under the Clean Water Act, a dischargeable facility has a duty to apply for a permit, otherwise it is in violation of law. And so while the question of what EPA can mandate is a separate legal question that I agree with you is problematic and that, as we point out in our brief, petitioners are tackling separate from this case. A facility that discharges does have a legal obligation to have a Clean Water Act permit. And the record is clear here, and our briefing is clear, EPA has not disputed that CAFOs do discharge in Idaho. And with respect to the Ag Stormwater Exemption, Your Honor, I just want to stress how, I'll say, narrow that exemption is. So case law from this court is clear that Clean Water Act exemptions are narrowly construed and the burden is on a permitee to show that it applies. It is simply not the case that any runoff from a land application area, so the fields that receive CAFO waste, is exempted Ag Stormwater. The facility must have complied with its nutrient management plan and other best management practices, and the runoff must have been caused by precipitation. In other words, the permit right now contains a zero-discharge ethanol limitation for dry weather discharges from land application areas, which does not implicate the Ag Stormwater Exemption whatsoever. So in a way, in terms of the legal question presented here, the stormwater exemption is somewhat of a red herring. Let me back up. Are you saying that everyone now is required, as a matter of law, to apply for a permit? I'm unclear about that. If a facility has jurisdictional discharges, then the Clean Water Act requires them to, they are either in violation of law or they are required to seek permit coverage, which allows them to discharge pollution. The baseline expectation of the Clean Water Act is there will be no discharge of pollution to jurisdictional waters unless a permit allows for that discharge. But that gets me back to my problem with the original waterkeeper decision and then the follow-up corporate position, and that is the regulation of the CAFOs is that they are not supposed to have any discharges whatsoever. And because they're not supposed to have any discharges whatsoever, they cannot be applied to do it for a permit because they're not asking for a permit in order to discharge. The permit says you can't discharge. And it was kind of like a catch-22, and I'm not sure I agree with those decisions, but I'm not quite sure why you're saying there's an obligation for them to apply for a permit when they're discharging because the discharging that they're doing is in violation of what the permit would allow them to do. I mean, I'm not making this up because I think it's right. I'm just saying I'm just trying to figure out what a waterkeeper is telling us, and I think that's the answer, which puzzles me. But so tell me again why they're required to apply for a permit because I think waterkeepers says they aren't. Of course, what Waterkeeper Alliance held was that EPA may not compel a facility to get coverage unless they are actually discharging. And I think a crucial part of your question there is that these facilities under the permit are not supposed to discharge, but the permit does not then go on to assure that they, in fact, do not discharge. And that's the problem. That's the accountability feedback, unaccountability feedback loop that I mentioned. And just going back to the record here, I don't think there's a dispute that CAFOs discharge. EPA in its own analysis in 2008, its own analysis concluded that approximately 75% of large CAFOs will have jurisdictional discharges. Went on to say that that includes essentially all large dairy and beef CAFOs, which incidentally are the type of CAFOs in the state of Idaho. I understand that. That's why I'm so puzzled by this whole procedure. But let me come back to what you're actually asking for. You're asking for additional monitoring within the terms of the permit and the type of monitoring you're asking for, I think was turned down by the EPA in its 2003 ruling. Isn't that right? That's right, Your Honor, but that has no bearing. Why is this a timely challenge? Of course, Your Honor, because the promulgation of ethanol limitations guidelines is an entirely distinct and separate action from issuing a permit under the Clean Water Act. The rubber hits the road when a permit is issued. And I'll note, in 2003, EPA's justification for not including particular types of monitoring was because it was, quote, more appropriately addressed, end quote, through the permit condition process. In other words, in 2003, EPA said we're not going to impose national monitoring standards because there's variation among regions. This is going to be more appropriately addressed when we issue permits. I'm reading the 2001 rule, and this is what I quote from it. I think they explain why they're not requiring the type of monitoring that you want us to now mandate. They say, in this final rule, EPA is continuing to reject imposing surface water monitoring requirements on TAFOs through the effluent guidelines because of concerns regarding the difficulty of designing and implementing, through a national rule, an effective surface water monitoring program that would be capable of detecting, isolating, and quantifying the pollutant contributions reaching surface waters from individual TAFOs. So I think what they say, as I read that rule, is that it's going to be impossible to determine where the effluent comes from, which of the TAFOs would be responsible. I'm a little puzzled by that. If that's the case, then, what do we do with that practical problem today? Your Honor, I think the operative word in the quote you just read was a national rule. The agency now has an opportunity to look at the facts and circumstances in the state of Idaho and how TAFOs operate in Idaho and fashion an appropriate monitoring regime. And so whether or not EPA didn't think it was appropriate on a national level, it must now do it in this particular context where it can look at specific facts. What I'm puzzled by is how you ascertain which TAFO was responsible. I mean, the effluent going into the Snake River comes from many sources. I mean, as a practical matter, how can you monitor this and cast liability and responsibility on any particular TAFO? Of course, Your Honor. If I may provide a couple of concrete examples that I think explain this. And this is nothing new to EPA in terms of how to do this. So one way that that can be accomplished, and this is a particular challenge for petitioners in terms of our ability to enforce the act. One way is in-stream water quality monitoring where there's a monitoring station immediately upstream of the facility and immediately downstream of the facility. The delta between those two sets of monitoring data shows what the facility contributed to pollution in that waterway. Similarly with groundwater monitoring, you simply have a station up-gradient and down-gradient, and the delta shows the individual facility's contribution. The situation that petitioners are put in here is we are able to go and take water quality samples and identify, okay, TAFOs are polluting this waterway, but we are cut out of the process of drawing a line of causation because individual facilities have never been, or are not required to do their own monitoring as every other... Can I just ask you about this? I mean, my understanding is that if waste is put on the field as fertilizer and then it rains, that doesn't count if it goes into the waterway. Because that's exempted from the Clean Water Act. So this monitoring you're describing would only work if you exempted rainy days or something like that to figure out if there's effluent that's not appropriate. So, again, I'll give a concrete example, but that may be helpful. So many fields, and I see I'm out of time. I'll answer the question if that's okay. This is an important enough case and a complicated enough proposition. We'll just talk as long as we need to talk. So just keep answering them. Don't worry. Excellent. Thank you, Judge Fletcher. So many fields that receive capable waste are equipped with what are called tile drains or perforated pipes that run under the field that are specifically designed to transport excess moisture away from the field. That is the quintessential end of pipe situation where a land application area that has received over application or the soil that's not suitable for receiving the waste, there is going to be a discharge from tile drain outfalls. And so that is something we raised in our comments to the agency that is a quintessential example of where actual discharge monitoring needs to occur and where other general permits for CAFOs elsewhere in the country have required just that, have required a visual monitoring requirement of tile drain outfalls before and after land application activities. It seems like the permit assumes that isn't happening. I mean, at least the mental image I have from the way the permit envisions this is there's some sort of storage container that isn't supposed to leak at all unless there's a huge storm event, like a 50-year storm event. And then everything else goes on the field and that's all exempted. I mean, that seems to be the paradigm that the permit assumes. Am I wrong? That's correct, Your Honor, but the permit assumes that and fails to actually assure that that outcome is what happens. But there is monitoring of the storm event of the storage container, right? They do actually require sampling of that. That's correct, Your Honor. That is the one actual monitoring provision in the permit. Now I will note that it's not representative of the production area. In other words, that monitoring provision is really only sufficient to deal with overflow discharges from a manure lagoon. The permit also allows for a continuous discharge rate from the liner of the lagoon and the permit has no monitoring provision to assure that that condition is met. And so there are other ways that a production area can discharge. There are milking parlors. There are feed storage areas. There is the animal confinement area. There are ditches and pipes on the facility. And so that monitoring provision, while exactly what petitioners say, all the other echelon limitations in the permit require, is really only sufficient for that one particular echelon limitation, as Your Honor has already said. I take it that there's no law that mandates that what you are seeking has to be implemented. So our concerns, I guess, would be to determine whether or not what has happened here is arbitrary and capricious. I think that's the standard we have to utilize. Am I correct about that? That's correct, Your Honor. Arbitrary, capricious, or contrary to law. Well, it's not going to be contrary to law because there's no mandate here that it be done, right? Respectfully, Judge Block, I disagree with that. EPA's own regulations at 40 CFR 122.41 mandate that all permits contain monitoring and reporting conditions as well as the practices and procedures and maintenance requirements that EPA intends to facilitate compliance. I don't read that as a mandate that you have to do what you're asking the court to do here, but put that aside. Why is it that what the EPA did here really doesn't ring the bell? It looks as if they tried to do their very best to assure that there'd be no pollutants that are going to be discharged into Snake River or whatever, and you're not satisfied with the reporting requirements and everything else? Is there anything short of the mandating of what you're seeking here that would satisfy you? In a different context, in a different factual scenario perhaps, but not here. Because EPA has not reached a factual finding that the best management practices mandated by the permit in fact result in compliance, that they are perfectly executed or perfectly effective, there's simply no way for EPA to, in a non-arbitrary fashion, reach the conclusion that actual compliance monitoring is not required at the end of the day. And the permit does try to assure that discharges will not occur, but it doesn't assure that. And keep in mind, water quality standards are also at play here, with the Act or the Water Court strict limitations when water quality standards are at play. In other words, the Arkansas v. Oklahoma in 1991 out of the U.S. Supreme Court held that EPA may not issue any permit at all if it cannot ensure that permitted facilities will not contribute to or cause impairments of water quality standards. Could I ask you about the Regulation 122.44 that you referenced a bit ago? It seems that you read an and into the list that has the monitoring of mass, volume, and other measures. I don't think there's an and, but I also don't think there's an or. It seems like you read in an and and your opponent reads in an or, and I'm wondering how you know it's an and instead of an or. Your Honor, I think that it's one of the many contextual cues in both the statute and EPA's regulations which make clear what monitoring, what both the agency and Congress contemplated when requiring monitoring of the Distinct Water Act. In other words, monitoring is not the inspection of a piece of equipment. Monitoring is with respect to discharges, actual discharges. But so that's the and. I mean, you think it needs to do all three. I'm wondering if this is ambiguous and so we need to defer to the agency about its interpretation of its own regulation on this. It doesn't seem so clear to me which one it means. Your Honor, under the 2019 case Kaiser v. Wilkie from the U.S. Supreme Court that re-articulated the hour deference standard made very clear that a court is to make a thorough review of the regulation looking to all interpretive tools available to it before reaching a determination that there is an actual ambiguity. In other words, that's the genuine ambiguity. And as I stated before, the many contextual cues in EPA's own regulations make clear that monitoring is about ensuring that discharges of pollution comply with the law. Whereas in section 122.41 sub e, EPA also requires that there be procedures and maintenance requirements that allow the facility to be in compliance. And again, 122.41 is not an either or scenario. All these conditions apply to all permits. But EPA's reading essentially writes out sub j about monitoring and reporting and says that we don't need to require monitoring because we have already complied with sub e. And that's just simply an unreasonable interpretation of that regulation. Let me go back to something that you said kind of in passing. And that was with respect to the liners of the lagoons. You said that they are, and I read this, that they are designed to have some leaking and that there is automatically then going to, inevitably then going to be some discharge. Is that correct? Did I understand that correctly? Certainly discharges, your honor. Whether it's a jurisdictional discharge, I think it's going to be facility specific. Now, what do you mean by a jurisdictional discharge? That's distinct from a discharge. Well, your honor, after the Maui case, again from the Supreme Court, a discharge into groundwater must be the functional equivalent of a direct discharge to surface waters. For a facility, for example, a facility in Idaho that has its wastewater lagoon sited adjacent to a jurisdictional water like the Snake River or one of its tributaries, that would be a strong factual scenario where a discharge from the liner of that lagoon would be a jurisdictional discharge. And so, again, some facilities miles and miles away may not have a strong factual scenario for EPA to regulate that discharge, but there are certainly facilities where EPA needs to be regulating those discharges and needs to have monitoring in place to assure compliance. No, no, I know, no, that's, now I understand perfectly what you mean. So if we've got a CAFO that's near the river and that the groundwater underneath the lagoon communicates with the river, my understanding of just the physics of this is that the liner will leak and that there will be discharge. Is that right? And the discharge will then end up then in the river so that it's a jurisdictional discharge. What am I missing, if anything? I don't believe you're missing anything, your honor. And the Snake River is a quintessential example of a waterway fed by groundwater. The hydrogeology in the Snake River Valley is well established and well understood. If that's so, why isn't it a requirement that that CAFO apply for a permit? I completely agree with you, your honor. But you never mentioned that to me when I was talking about, well, wait a minute, there seems to be no requirement that they apply for permits. So are we leaving out that category of CAFO? Not at all, your honor. And I apologize, I can't speak to why a regulated entity or a potentially regulated entity would opt to not comply with the law. But it is our belief that there are many CAFOs in Idaho that as a matter of law are engaged in discharges and therefore have liability under the Clean Water Act. Engaged in discharges and are permitted under the current permit to discharge? That is to say the leakage or seepage out of the liner, is that permitted under the permit as it now exists? It is, your honor. It's a small amount. I tried to do the math based on the regulatory requirement and remembered why I did not pursue a career in mathematics. But it does allow for a small amount of continuous discharge. But there's no way for regulators or petitioners or anyone else in the public to know if a facility has exceeded that discharge rate. But if a CAFO is doing that, if it is discharging through the liner from the lagoon, and if it then goes into navigable water so that it's a so-called jurisdictional discharge, it seems to me then that there is a requirement that this entity apply for a permit. This doesn't sound as though it's optional in the sense that we've heard in Waterkeepers. What am I missing now? Again, I don't believe you're missing anything, your honor. And while it's not the grab-em-in-a-biscuit, Wooden Water Watch submitted a petition to EPA in 2017 calling for it to do exactly what you're asking for, to put the foundation together, create the factual findings and the presumption that such facilities actually need permit coverage. And EPA has declined to take a step on that offer thus far and so hopefully one day we will reach that point. But I couldn't agree with you more that those facilities need to have permit coverage. And so they don't qualify what I'll call the analytic or categorical exemption of Waterkeepers. So why are we not required to defer to the expertise of the EPA in the sense of the monitoring is either too difficult, too expensive, too imprecise, impractical, whatever set of reasons they've already induced for saying we're not going to do that. Well, your honor, in this case, they have not pointed to a technical finding or any finding of fact as to why they have refused to require actual monitoring in the permit. What they have said is that they have made an interpretation of what monitoring is. And they have said that we have a framework that we hope will result in zero discharge based on methods. And so we're simply going to assume or expect perfect outcomes from that. And so there's no factual finding here. There's no scientific technical basis for their conclusion. It's simply an interpretation of the law. And the expectation is exactly what the Second Circuit held EPA could not do in the NRDC v. EPA case, what the briefing calls the Vessel General Permit Case, where EPA took one set of permit conditions and then expected compliance with another, and the Second Circuit rightly said EPA cannot do that. Every employment limitation or water quality standard deserves its own appropriate representative monitoring to assure that a facility complies with that. The odd thing here is that the limit is zero in some, like, imputed sense or something, though, right? So I don't even know quite... Don't you have to change that before you can have anything to monitor? No, Your Honor. Excellent question. So let me explain what this would look like. And EPA knows how this works. In its discharge monitoring report form that it instructs states to use and it uses itself, it tells point source operators that if they don't have a discharge in any given reporting period, that's what they note in the reporting document, no discharge. And so what this might look like for a case, though, would be a line entry that says May 6, 2021, outfall number 001, no discharge. And it would be a series of those types of monitoring outcomes. And then that document would be reported out to the public under penalty of perjury, and that would assure compliance with the zero discharge limitation. So that the permit has a strict zero discharge limitation by no means obviates the need for actually ensuring a facility complies with that. Quite the contrary. It's all the more important because the state's 401 water quality certification was based on an expectation of no discharge. The biological evaluation under the Endangered Species Act was premised on an expectation of zero discharge. So the zero discharge expectation is at the core of this entire scheme. And that's why it's so critical for petitioners and for water quality, that the permit actually assured that at the end of the day, in fact, there were zero discharges. Okay, now I'm confused again. I thought you just told me that there is discharging, but now you tell me there's no discharging. The permit, if a facility is complying with the permit perfectly, EPA expects there to be no discharges. Well, what about the seepage out of the liner in the lagoon? You just told me that there is discharge. Frankly, Your Honor, I think it's a discrepancy in the permit itself and a discrepancy in how EPA talks about the permit. And what I'll say is, there are also the actual narrative limitation for land application areas is that discharges be minimized. Okay, so the permit contains a variety of zero-discharge employment limitations. For example, the production area is subject to a zero-discharge limitation. So I'll also continue to be confused. And I just want to understand again how it will be that if we have this water monitoring, we'll be able to identify pollution from a particular KFAR. I think you tried to explain it to me once before, but I'm not so sure I understand it. Because that seems to be the problem with the 203 rule that they said, you know, you can't do this. So I'm just a little bit puzzled by that. Yes, Your Honor. And again, the critical thing that should be happening here is for facility-specific monitoring to take place. So where Your Honor's concern arises is when you are downstream of multiple facilities. And that was the concern that EPA was raising with respect to why it didn't want to do a national one. But that's exactly why particular facilities must be monitoring their own discharges because that's the only way to draw a line of causation and allow any sort of enforceability under KFAR. But they are monitoring their own, I assume, aren't they? They are not, Your Honor. There's no requirements in the permit for them to even look at identifiable discharge points. So the example you just gave us of, well, they report that nothing came out of the pipe at 001. You say that's a hypothetical. That is to say that's not in the permit and you want that in the permit. I'm continuing to be a little confused. I apologize, Your Honor. Yes, you are exactly correct. That the permit does not require such a monitoring report to be generated and that data will never exist. And that's exactly what we're saying the permit needs to do. But the pipe where you could do that 001 thing that you just said would be these pipes that you say are under the fields where the fertilizer is put, but that's not really going to address the liner question  Am I understanding that right? That's right, Your Honor. There are two separate areas that a CAFO may discharge and those are not the only ones. There are ditches. There are intermittent streams that run adjacent to or through CAFOs. So there are a variety and the petitioner's opening brief pages, approximately 14 to 22, provides several record sites and examples of what discharges from CAFOs look like based on EPA's own risk assessment of CAFOs, that go through the myriad pathways that pollution can be discharged from. How would you monitor the liner issue? It's a well-established technology used by CAFOs elsewhere. You simply install a particular type of liner and then there's a leak monitoring system that's readily available on the market. So my question is, why is it that EPA simply doesn't want to do what you want them to do? What is their rationale and thinking behind that? Your Honor, I don't want to speak for EPA. I will let my friend on the other side answer that question. EPA tried twice in the two cases that you are all familiar with now to have a more robust regulatory system for CAFOs and it was shot down by courts twice based on the duty to apply approach. So I will let the other side respond to that, but I don't think there's any sort of practical or technical reason why EPA could not rather easily require the type of monitoring that the law requires. Okay, well this may be the right time to ask to hear from the EPA and we'll let you,  Thank you, Your Honor. Good morning, Your Honors. My name is Ben Gurleo. I am the Department of Justice in the Environmental Defense Section representing EPA here as a respondent. Can you stop for just a minute? There's something very odd about your sound. I don't know whether you're capable of fixing it or whether we can fix it. I mean, I can hear it, but it's a sort of a deep echoing sort of difficult for me to hear. Is this any better? Try some a little more. Okay, this is Ben Gurleo. What do you guys think? Yeah, no, it's the same crappy sound, but that may be the best way you can do it. I apologize, Your Honor. Mr. Grillett, I have one, something I can mention. If you can bring down the audio on your speakers a little bit, as much so that you can hear the judges fine, but that should help that particular issue. Is that better, Your Honor? It's a little better, yeah. Okay, let's start at 15 again and see what happens. My name is Ben Gurleo. I represent the United States Environmental Protection Agency, the respondent in this matter. And as Your Honor has noted, EPA's monitoring requirements for this new cease permit in the context of the existing overall regulatory scheme that was carefully crafted through multiple federal rulemakings that were challenged and upheld as well as here in the Court of Appeal should be found to be reasonable and not arbitrary and capricious here for three reasons. First, as Judge Friedland noted, the regulations themselves do not require the type of monitoring that petitioners claim. Do they require any monitoring at all? They require monitoring as applicable. I think the important part of the intro of 40 CFR 12244 is that those particular requirements to be put in place were applicable. And here, with a zero discharge limit, the CAFO regulations are different than, say, a wastewater treatment plant or other facility that has a continuous flow from the end of a pipe. The limitations here are distinct. And even going to 12244 I-123, the third category of other measures as appropriate, I think Your Honor is correct that EPA reads that as an or. I would point out that in petitioner's opening brief on page 37, they also place an or when recited in those three categories. How do we know it's an or, though? It doesn't say or. I think going back to the beginning of 12244 and looking at the as applicable language indicates that these provisions generally are to be considered and applied individually as needed or as applicable. If you look at the structure of the particular regulation as a whole, other measures as appropriate is a different way of measuring mass or volume. It wouldn't necessarily make sense to have to do all three. And notably, it's that as applicable language and the other measures as appropriate language that the state court in Maryland looks to when deciding that a similar monitoring regime, again, under a state permit that was also challenged by petitions here, was reasonable and outheld it. The EPA has discretion... Let me interrupt. I understand that. I'm kind of dazzled by all these regulations and the numbers and the ands and the ors and everything else like that. But my question may be naive, but why simply can't they do it? What is the reason for not doing it? I don't think the question is... The question here is whether EPA's permit that's in front of you, this permit, is arbitrary and judicious. I think the upper limit of what EPA could do is a different question. And I think the question here is whether this permit, as your honors noted, strikes a balance between getting people to comply... I understand your argument, but can they do more? Can they do it? As a practical matter, is there some obstacle in their path of giving the petitioner what he wants? Realistically, I'm just trying to understand what we're talking about. Realistically, there's no statutory or regulatory obstacle to putting in place higher limits. But the question here is whether these limits and this permit are adequate and this monitoring is adequate. Why would you not want to put in high limits? It seems to be something that would serve the environmental concerns that we have. Why not do it? EPA has considered, as you noted, in their earlier rulemaking, the possibility of putting in the surface water monitoring that the petitioners are asking for. And I think particularly for that particular point, the surface water monitoring at the edges of fields, the agricultural stormwater exemption indicates that if the permittee is complying with their nutrient management plan, if there's stormwater runoff, then that is exempt ag stormwater. So the discharge itself isn't necessarily proof of a violation. You can show that there's a discharge. You can show that that discharge contains whatever it contains. If it came up because of rainwater, then it's not a violation. This is why I was asking earlier about whether you could monitor and then just skip the rainy days and look at the days that weren't raining. I understand that argument for why you wouldn't look at the rainy days for the monitoring, but why not do the monitoring and look at the dry days? So there is monitoring on the dry days. And let's sort of talk about what the monitoring is in place for the land application section, which I think is important to understand here. So when a farmer or a permittee is placing manure onto the fields in the land application, it's a land application day. And they're out there in the field and they're putting a land application on. They are required to note the method of application, the soil surface conditions, which would indicate how wet that soil is, the weather conditions on that day, the amount that they applied, where they applied it. And they're also not allowed to place land apply to frozen or saturated soil. And saturated soil is a situation in which if you apply it to a field that's wet, it's going to more likely run off. They're not allowed to do that. So they have to discharge to dry soil and they have to very carefully document all of those various features while they're walking around on the field during the day of their application. But that's not monitoring. That's a requirement. It's what they're supposed to do in terms of application. I think Judge Friedland's question was what about monitoring on a non-rainy day when there's not going to be runoff that is exempt? Yes, Your Honor. So if you're applying on a non-rainy day and you're walking around and you're putting the manure on the field, you will notice if there are discharges that have come off of the field and are working their way to a water. And if you notice that, then you are required to report it because that is a discharge and you have to then raise your hand and report to EPA what happened. You're also not allowed to apply within 100 feet of a conduit, which would be a means of getting to water in the United States. And that's a setback requirement. So the permit as a whole is designed to ensure that there are no dry weather discharges and put in place mechanisms for people to notice that. Do farms use irrigation in Idaho? Yes. So you just explained that on the day they're putting the manure on the field, they're there to look. But what about three days later when it hasn't rained and now they're irrigating? Is anyone looking to see whether there's runoff then? Irrigation needs to be... not expressly in the permit. I didn't think so. So why not? Because that seems like a real opportunity for pollution. I think the permittee has an obligation to monitor, to ensure that there are no dry weather discharges and if there are, then to report them. What requires them to do that? I don't understand that. First of all, they don't even need to get this permit. And then even if they do, I don't think there's anything that requires them to be out there on the day that they're not putting it on till we'll be looking. I think that if the permittee is complying with the nutrient management plan and that they're applying the manure in a rate that's carefully designed by the state of Idaho and others to have an uptake rate where the crops are going to be absorbing the nutrients that are applied to the field, that you have to very carefully adhere to your budget that's developed through annual sampling, comparisons of the nutrients in the field with the nutrients in the... You're saying that reporting is a trick and that if people can report, they may not be accurate in correcting their reporting. Is this some sort of a fail-safe way to ensure that the reporting is accurate and that there is no effort that's going into the Snake River? The permittee has an obligation. All NIFTYs permits work through self-reporting. The permittee has an obligation to self-report any time that they observe violations. How can those be doing it accurately? If they're not doing it accurately, then that is a violation. They are in violation. Exactly. How do we find that out? I think that... If a citizen has a concern, there are other enforcement tools that EPA has and EPA uses to go after CAFOs permitted or not, including inspections, including responding to citizens' complaints, including responding to concerns, and we'll launch an investigation. We'll initiate it. So at a certain point, there is a set of provisions here that are reasonable and sufficient to protect against the limits that are very clearly drawn, that there can be no driver-related discharges. But I don't think it's contested. We have a lot of evidence on the record that there's an enormous amount of pollution coming from these CAFOs. I mean, that's your own evidence. So you can't say, hey, this system's working well. You may be able to say that the system is legal, but you can't tell me that it's working well because we know from the record that your agency itself has compiled that we're getting a lot of pollution coming from the CAFOs. And I think, as your honor has noted in the argument with my friend on the other side, that some of that comes from the regulatory regime that we're working within. The exemption for agricultural stormwater, for example, the event that a runoff from the field that occurs due to a precipitation event is exempt from Clean Water Act regulation. And similarly, EPA's inability to essentially require people to apply for the permit if they expect to discharge. If those two criteria are the issue, that can be addressed through other enforcement means. When you say other enforcement means, it doesn't sound as though EPA is actually doing much for other enforcement means. I mean, it's possible, but it doesn't seem like it's not happening. So that's outside of the context of this particular permit, your honor. Yes, I understand that. But you're kind of trying to make me say, hey, don't worry about it. It's all taken care of. We've got other means to do this other than through the permitting process. Well, yes, maybe there are such things, but the EPA doesn't seem to be doing it. EPA, to my knowledge, does in fact engage with the State of Idaho to conduct, and they haven't been doing them because of COVID recently, but what they call targeted inspection blitzes, where they will actually go out and identify particular CAFOs and do surprise inspections. EPA does in fact work with the State of Idaho to ensure that even the CAFOs that are not permitted are, as my friend on the other side pointed out, if they discharge, they are in violation of the Clean Water Act. And how does EPA figure out whether they're discharging in those inspections you're describing? Well, in those inspections, they would look at the sorts of things that we've been discussing here. They would look at the containment areas, they would look at the impoundments, they would look at the fields themselves, and they would be able to identify whether there were any improper practices or procedures that would result in discharges, that there was evidence of discharges. You have a lot of knowledge, which I do not have, and you're obviously an expert and I'm not, but what practically is the cost or what is the burden of having to simply put in the type of monitoring system that the adversary would like to see happen? What are we talking about realistically? Is it enormous expense? Is there any practical reason, any other reason why EPA would not want to do this? I think the question is, again, whether this permit is reasonable. In terms of the obstacles or the costs or the burdens, the question is really whether in a zero-discharge permit environment, the types of visual inspections and other inspections are sufficient. In terms of the burdens on the other side, I think as Josh really noted earlier, there's only one K-code that is applied for coverage for this permit, and that you need to balance the desire of coverage with... I'm not so sure you answered my question. It may be naive and simplistic, but I just want to get a sense of what's involved here, what costs are involved, what is the real reason why they don't want to simply do that. It can't hurt to do it. It can only be a benefit to the environment. I think, for example, with the monitors at the edge of the field, for example, at the entry point to the stormwater, the point that you made about how you couldn't differentiate between various upstream sources, combined with the fact that ag storm runoff will discharge as a result of weather events, are not in and of themselves violations, that the violations would only establish if the person is not complying with their nutrient management plans. So it really wouldn't tell you that much. Tell me it's basically academic. It would not accomplish anything. Certainly, compared to what you can accomplish here, which is restricting zero dry weather discharges and putting in place systems that would require you to notice those dry weather discharges and report them. And in the production area, there are additional requirements, monitoring requirements on a daily basis. You're required to walk all of the water lines throughout the entire facility to see if any of them are leaking. They're required on a weekly basis to visually inspect the impoundments, which includes the lagoons and the lagoon liners. And they're required to measure the depth of the containment structures to make sure that there's enough volume in that containment structure to contain a 25-year, 24-hour storm event with additional freeboard on top of that. And so these visual notes, and in that process they are required to report any violations, are analogous to the visual machine case that is another NRDC versus EPA case that was zero discharges for oil and gas on platforms on the Gulf of Mexico, and it was enough to be able to look at the water and see oil in a zero-discharge environment to constitute sufficient monitoring. Can you go back to this idea that no one is currently covered by this permit? I mean, do you view this whole case as just a theoretical matter, or what's at stake here? EPA wants people to be covered by this permit, and so at stake here is whether the monitoring requirements are sufficient to identify violations to the discharge limits, and this permit accomplishes that and is reasonable. What kind of an administrative record do we have or do we need to have for the EPA to tell us that it has sort of thought its way through the cost and the benefits of requiring monitoring? I think that administrative record exists in the Waterkeeper Challenge, including the language that Judge Block quoted before. The EPA did an extensive analysis and determination. In Waterkeeper, they came up with a set of seven options regarding different types of pollution controls, including option four, which would require sampling of surface water that's adjacent to the production areas and or manned under the control of the CAFOs, and they very carefully weighed all of these various options in the national guidelines. Those were challenged in Waterkeeper, and the court upheld EPA's decision to go with option two. Yeah, let me ask you this, but so why is the decision at the national level the appropriate decision for Southern Idaho? I think they're the same considerations in terms of weighing the cost and benefits of the types of monitoring here, particularly in light of the Agricultural Stormwater Exemption, and it makes it reasonable in this context to put in place monitoring requirements that are congruent with the national guidelines. And in some places, the permit here actually exceeds those national guidelines. It requires annual sampling of the soil in the field. Here's my question. It really goes to your argument, to use your phrase, that this ship has sailed, in the sense of whether or not the question is resolved once and for all by the national determination not to require this kind of monitoring, compared to, well, now we're in a specific location, specific state, specific conditions that may not be generalizable, and they may not be the same considerations that the EPA was thinking about in 2003 nationally. Judge Freeland's question as to irrigation, I think, is an important one. I mean, I know Southern Idaho. That farming is irrigation farming. So there's a lot of water that goes onto those fields. In fact, it's a fairly arid country. The actual number of storms is where you're gonna get a lot of runoff compared to the water going onto the field from irrigation. That's irrigation country. So it seems to me that this is a very different situation compared to a non-irrigation field, maybe in the Midwest, where they depend on natural rainfall. So now I just want to go back to the question of been there, done that. This is too late to make the challenge. Why do we say that, listen, that determination in 2003, that's the end of the matter? I think in terms of cost-benefit analysis, as you were discussing, and the concerns about whether requiring any additional monitoring would actually be of significant benefit, is reasonable to go back to the 2001 rulemaking 2003 case. But even here as applied, I think the conditions in the permit are reasonable. And notably- Let me interrupt for a minute. You said it's reasonable to go back. My question is a slightly different one. Is it a question that can no longer be challenged in this context because of the decision that was made on a nationwide basis over 15 years ago? That is EPA's position. But even if you evaluate this permit as applied, the permit itself is also reasonable. Okay. And those are two different questions, right? But it seems to me that what you've got is a lot of irrigation going on those fields, and the stormwater events are relatively rare. I understand that the runoff from the stormwater is exempt. That doesn't count as a controllable discharge. But if most of the water going on that field is from irrigation, it seems to me you may actually want to do some monitoring as to what's happening. I think the monitoring that's in place is sufficient. And in terms of regional conditions- What monitoring are you talking about? You're talking about what the farmer is supposed to do. I'm talking about far-end monitoring in terms of what the actual discharges are. I'm not sure there's any of that. There's no requirement for it. That's what my friend would call the end-of-pipe monitoring or the monitoring at the end of the field. Right. But in terms of regional conditions- What you're talking about is performance standards rather than monitoring as to whether or not it's successful. Keep coming. Can you repeat that, Your Honor? Yeah. I'm sorry. I shouldn't be being close enough. What you're talking about is performance standards rather than monitoring at the far end to see whether or not it's been successful in limiting or eliminating the discharge. We've got to be careful when we're talking about monitoring is what we mean. I think you and I are not using monitoring in the same sense. I think that's right, Your Honor. And for monitoring, what I mean is visual inspections during the application process in conjunction with any other visual inspection or other inspection in connection with following the nutrient guidelines and the best management practices, which include uniquely in Idaho, not uniquely in Idaho, but because of the conditions in Idaho, a restriction on applying the sack to frozen ground. A bigger issue with runoff in Idaho is that the fields, when they freeze, if there's been a rain event after on a frozen field, it can create significant runoff. This permits a restriction on application to frozen fields. This may be an unfair question. Have you ever been to Idaho? I have been to Montana. I have not been to Idaho. So you don't know this area along the Snake? I've been to the T-Zones, but no. I'll tell you what it looks like. It's lots and lots of fields with lots and lots of irrigation that drain into the Snake. And what I can say, Your Honor, is that the permit writer lives in Boise and is very familiar with the conditions in Idaho and was aware of them when drafting the permit. So when asked earlier about the cost-benefit analysis of why not to do more monitoring, you referred back to 2001 and 2003 and the Second Circuit opinion. But that's a long time ago. So is it really the case that there aren't new technologies for monitoring that might be less expensive than what was considered back in 2001? How do we know that that same cost-benefit analysis applies now in 2020 in Idaho? I think that the record here involves a decision that the permit has a zero-discharge limitation for dry-wet discharges, and that in order to ensure that that limit is met, to ensure compliance with that, the monitoring provisions here were sufficient. I think it's a different question as to whether or not EPA needs to have fully considered and rejected significantly or different higher bars. The question is whether this permit is reasonable and not arbitrary and capricious in its ability to assure compliance with a zero-discharge limit from the production area and a zero-dry discharge limit from the land application areas. So when we're talking dry weather discharges, just to make sure I understand the vocabulary, that means discharges during periods when we're irrigating. It doesn't mean dry field. It means not raining. Yes. The intent of the agricultural stormwater exemption was to make it such that if there was a weather event that caused the discharge that the landowner... But it's not going to be the case that in dry weather you're not going to get discharges because you're going to put water on the field by irrigation. That's right, Your Honor. And it seems like there will be discharges and no one is watching. Am I right? I think if the irrigation is done in a manner compliant with the nutrient management plan and compliant with the budget that the field sets and in compliance with the guidelines that are set up by the University of Idaho's program for application of manure to fields, if that is all done including the irrigation at the appropriate rate, then it is very carefully designed not to discharge. But who is making sure that that... I mean, it sounds very complicated. Who's making sure that happens? The compliance with the budget is the requirement... The evidence for that would show up in the annual reporting that the permittee is required to do. They would indicate what the sampling results were, what they find in the field. Well, the soil sampling happens once a year. I mean, to really have no runoff from the irrigation, it seems like you'd need to be sampling every day at least to make sure that the balance is exactly right so the water isn't... I mean, I can't imagine how once-a-year soil sampling is going to tell us whether this is being met. I think the rate of irrigation is what would actually make the bigger difference in terms of limitations on that. Okay, so who's monitoring that? Ultimately, if the permittee notes dry weather discharges, even as a result of irrigation, then that is the monitoring device that is in place on this permit. But the permittee isn't required actually to monitor what's coming off the field. Not with a device of the type that petitioners are asking for, but through visual inspections or through their compliance... Is there any requirement to go look around the edges of the fields on an irrigation day that's not a day when you're putting the fertilizer on? Not that I'm aware of, yeah. So, I mean, this is so unsatisfying because it seems like there's a real problem, but I mean, even if the permit was better, we also don't know that anyone would ever apply for it. So what is EPA doing to try to make sure that people at least comply with this permit? Well, EPA has added to show a little wide variety of enforcement tools. As noted, if you have not applied for the permit, any discharge is a violation of the Clean Water Act. And here, if you're violating the terms of your permit, then you are also in violation of the Clean Water Act. And EPA can use its Section 308 authority to conduct investigations, to do site inspections, to inspect records, to follow up on this. And that's EPA's intention to do that, and it does do that. Do we have anything? I doubt we do, but I'll just ask the question. Do we have anything in the record in terms of what the EPA has done over the last 10 years in Southern Idaho in terms of sort of checking, finding violations, and so on? You tell me that they're doing it, but what do we really know? Well, on the record here, which was a challenge to this particular permit, in particular the monitoring provisions of that permit, and the development of that in that record does not include evidence of enforcement of Clean Water Act violations at CAFOs generally. So I can get back to you with that information and submit a supplemental if you'd like. If it's not in the administrative record, it's not in the administrative record. No, I'm not. If we want something like that, we would specifically ask for it. Don't bother volunteering. I mean, ultimately the question is whether or not the Clean Water Act requires the type of monitoring that petitioners are asking for, and here EPA has implemented a regulatory monitoring regime that is sufficient to measure and assure compliance with the permit regulations. Well, that can't be right, meaning we know that there's a huge amount of pollution going into the river. So you can say it's all they're required to do by law,  I think your argument to the extent that pollution in the river comes from agricultural stormwater discharges, then those discharges are not within EPA's regulatory mandate. Of course I understand that. Of course. So I don't think you can just point to pollution in the river and say that that indicates that this monitoring regime is not sufficient. I don't think that's accurate. Okay. Any further questions for the government? No. Okay. Thank you very much. Let's put three minutes on the clock for Mr. Libdale. I'm sure we'll fit within that time period. Thank you, your honors. Two really important points that I hope to cover and then address any further questions the court has. First is this idea that the permit requires facilities to report violations. I want to explain why that is insufficient and your honors have already hit on one reason. One is the issue of undiscovered discharges. And the second is the distinction between compliance data and reporting a violation. So on the first, it's simply not true that when a land application activity occurs, there is an individual on the field. Oftentimes these facilities have automatic systems where waste is pumped directly from a production area lagoon onto an automatic irrigation boom that sprays onto the field. In other words, if anything goes wrong with the equipment, the topography of the field has changed for whatever reason, there will be no one there to discover the discharge. And that's why it's so critical that the permit require that facilities actually look at the discharge points to ensure no discharge occurs because there will be unpersoned activities that will result in discharges. And second, Congress, and this is cited in the legislative history at page 51 of our opening brief, Congress intended EPA to require more than merely a facility to report its violations. It wants compliance monitoring. And why does that matter? Because compliance data is a broader, more useful universe of information than merely submitting a violation. That is data affirmatively put forward whether or not there was a violation, again, made under penalty of perjury, that allows petitioners to say that facility was in compliance, as opposed to the inferential leap we're forced to make where even if somehow we find out that a report was submitted about a violation, we then have to say, okay, well any facility didn't report such a violation was in compliance, which is not what Congress wanted. It's not the straightforward enforcement mechanism that monitoring is intended to cover. And then finally, in terms of the question about cost and expense, I really want the court to recognize that this permit, EPA's best professional judgment exercise in issuing this permit is that the best management practices required will not only result, with what are called technology-based echelon limitations, which are the echelon limitations based on practices, also water quality standards in the state of Idaho, which as I noted, and as our brief goes into detail, there are severe water quality impairments right now in watersheds heavily populated by CAFOs. And if the EPA cannot fashion a permit that ensures no further impairment or causation of those impairments, it may not issue the permit altogether. There is no cost benefit analysis when it comes to water quality standards, as opposed to the other part of the Clean Water Act dealing with technology-based echelon limitations, the technology here being best management practices. And so the cost issue really doesn't come into play because of the circumstances in Idaho. Let me ask you a question. This is a practical question and you may or may not know the answer. I'm trying to figure out to the extent that it can be calculated or estimated. Where, what are the most serious problems of the CAFOs? Is it the dry weather field stuff? Is it coming from the feedlots? Is it coming from the seepage from the lagoons? I mean, if we're talking about where's the most serious part of the pollution coming from? Can you tell me that? Do we know? Your Honor, honestly, I would say all of the above. What I would do is I would point the court to ER 353, where in EPA's own analysis, it cites a study that identifies tile drains as, quote, the source of most of the nitrogen added to surface waters in an area that uses that sort of equipment. And so tile drains are one particularly problem. I mean, land application areas in general are problematic, but because of this sort of history of deleterious regulation and of the failure to require the kind of monitoring that the law requires, it's very difficult to answer your question. And again, I would have a concise answer for you if EPA were complying with the law and requiring discharge monitoring in the CAFO permit strategy. Okay, good. The fact that the water quality is bad could be from the exempted stormwater. So it's a little hard to know. I mean, part of the problem is the act itself, right? What do you mean? The Clean Water Act itself, which EPA can't do anything about. I mean, Congress decided to specifically enumerate CAFOs as a point source in 501 sub 14. So Congress fully recognized that CAFOs were a threat to water quality and went out of their way to, in addition to generalized traditional conduits, pipes, ditches, what have you, specifically identified CAFOs as point sources that threaten water quality and that need to be recognized. Yeah, but because of the exemption, it makes it kind of difficult to really ascertain how effective water monitoring can be. I go back to my point that I made earlier, Your Honor, and the case there, because I don't believe it's in the brief, but I'll provide it quickly. This is Northern California River Watch, the city of Shieldsburg, site 496S3993, the Ninth Circuit case from 2007, held that the Clean Water Act exemptions are narrow and that the burden is on the permittee to establish that the exemption applies. In other words, the way this should work is that the facility should monitor discharges. If there is a discharge, then the burden is on the permittee to establish that it complied with its best management practices and the discharge was caused by precipitation. That's the way this regime should work. In other words, the way it's being addressed now is the exemption is swallowing the rule, and that's just, it's just inappropriate and it cuts the legs out from the Clean Water Act when it comes to these issues. And so the Ag Stormwater Exemption, again, is really, I'll say, it's sort of a red herring in this case, and I don't believe makes this more complicated than it needs to be. At its simplest, Judge Friedland suggested that a system that don't monitor on a rainy day would be one reasonable way for EPA to approach this. And the last point I'll make, Your Honors, is I just want to make it clear. Petitioners are not coming to EPA or this court with a strict menu of monitoring provisions that we demand be included. EPA has discretion to fashion appropriate monitoring schemes for the conditions at hand, so for the situation at night. What it does not have the authority to do is leave out representative discharge monitoring altogether. And unless the court has further questions, we would ask you to grant our petition, remand the permit to EPA so that it may comply with its own regulations and this court's findings. Thank you, Your Honors. Okay, thank both sides for your very helpful argument. You can see we're struggling with this, and you've done one, both of you have been very helpful in, in a sense, just educating the court as to what's going on here. So thank both sides for a helpful argument. Food and Water Watch and Snake River Waterkeeper versus U.S. EPA now submitted for decision, and we're adjourned for the day. Thanks very much.
judges: W. Fletcher, Friedland, Block